Filed 3/14/13  P. v. Martinez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C068863 |
| Plaintiff and Respondent, | (Super. Ct. No. SF113022A) |
| v. | |
| MANUEL MARTINEZ, | |
| Defendant and Appellant. | |

Defendant Manuel Martinez was charged with molesting two of his daughter's friends, H. and R.  A jury found him guilty of two counts of committing lewd acts on H. and one count of annoying or molesting R. (which was when R. participated in giving defendant a back massage).

On appeal, defendant raises the following four contentions:  (1) there was insufficient evidence he annoyed or molested R.; (2) the court erred in excluding the testimony of H.'s fifth grade teacher; (3) the court erred in admitting rebuttal evidence that he molested his niece Y.; and (4) the court erred in refusing to excuse Juror No. 4. Finding no merit in these contentions, we affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *The Prosecution's Case-In-Chief*

Defendant was raising his 11-year-old daughter J. alone in a house they lived in together.  At the time of the charged molests, J. was in fifth grade with her friends H. and R., who were about the same age.

H. and J. became friends in teacher L.B.'s fifth grade class, and H. started going over to J.'s house in the winter of that year, 2008.  H. was 10 years old at the time.  During one visit, perhaps the first, defendant had H. sit on his lap and he put his hands underneath her clothes, touching her near her breasts and pubic area.  H. told J. what her father had done, and J. responded, " 'Yeah, he does that to all my friends.' "

Another time, defendant took H. and J. to a movie and then to the Dollar Tree where defendant bought H. some trinkets.  Upon returning to J.'s house where H. was going to spend the night, defendant touched H. underneath her clothes near her breasts and pubic area.  Later that night, defendant suggested J. and H. rub lotion on his back, and they complied.  The girls were on defendant's bed when this happened and defendant was lying down shirtless on his stomach.  The girls then went to sleep on the floor in defendant's bedroom.

The last incident with H. occurred when defendant took H. and J. to the snow.  H.'s clothes got wet while she was climbing up a mountain, so she went back into defendant's truck to change clothes.  While she was changing, she saw defendant looking inside the truck, watching her change, which made her uncomfortable.

Later that day, H. told her sister and her sister's friend about "what happened" and her sister told their mother, who in turn called police.  When San Joaquin County Sheriff Deputy Robert Cleary responded, H.'s mother said she had information that "this had happened to other girls as well."

H. told San Joaquin County Sheriff Deputy Nicholas Moreno, Jr., during an interview at the Child Advocacy Center that defendant had also molested three of her friends and J. During an interview, J. told San Joaquin Sheriff Deputy Nelida Stone that H. said defendant had touched H., but J. did not know of her father touching anyone else.

H.'s fourth grade teacher was Laura Viss. During the first quarter of the school year, Viss wrote the following on H.'s report card: H. " 'needs to remember . . . to be telling the truth at all times.' " Viss explained at trial that H. "had a tendency to lie over everything; small things, big things, it got to the point where I couldn't rely on [H.'s] word." The small things were why she did not get her homework done or what happened to her pencil or textbook. The big things were " 'problems out on the playground for the most part, name calling and swearing.' " The situation improved after H. was put on medication, which Viss knew H. was on through the end of fourth grade.

R. was another one of J.'s fifth grade classmates who spent time at J.'s house, including sleeping over. One time, when R. was 10 years old, defendant took R. and J. to a movie and then dinner. When they got home, defendant went into his room to watch television, and the girls went into the living room to play. The girls then came into defendant's room and continued playing. Defendant, who by then was wearing only a pair of exercise pants, told J., " 'Oh, my back hurts.' " J. responded, " 'Okay. I'm going to give you a massage.' " J. and R. began rubbing defendant's back with lotion while defendant was on his bed lying face down on his stomach. R. could not remember whose idea it was for her to help. R. felt uncomfortable. After the girls were done massaging defendant's back, all three went to sleep on defendant's bed.

About one to two months before the massage, defendant took J. and R. to Wal-Mart and bought them each an outfit. He then took the girls out to dinner. At some point, defendant asked R. to call him " 'daddy.' " She did so, which upset R.'s father when he heard R. talking to defendant on R.'s cell phone and referring to defendant as "daddy."

David Love testified regarding child sexual abuse accommodation syndrome. The syndrome consists of the following five symptoms that children who have been molested may display: secrecy, helplessness, entrapment, delayed disclosure, and retraction. Love described the syndrome generally and had no information about this case.

## B

### *The Defense*

Defendant testified on his own behalf. He was a laborer who often had a sore back. When his back was sore, J. "want[ed] to help [her father]" relieve his pain, so she would volunteer to rub his back. The night R. helped rub his back, R. was the one who asked to help. H. never gave him a back rub. He never put his hand up H.'s shirt or down her pants.

In addition to his own testimony, defendant presented a number of character witnesses. E. was J.'s classmate who had been to J.'s house multiple times and spent the night, and nothing happened between E. and defendant. Both of E.'s parents knew defendant and never saw him do anything that caused them concern. Both of defendant's employers never saw him behave inappropriately with any girls. Defendant's brother and defendant's nephew also noticed nothing unusual about the way defendant interacted with J. or other girls.

## C

### *Rebuttal*

Y. was defendant's niece. When she was 11 or 12 years old, defendant forced her to keep hugging him, and when she tried to move away, he "accidently touched [her] boob." The incident made her feel "uncomfortable," so she told her mom.

4

DISCUSSION

I

*There Was Sufficient Evidence Defendant Annoyed Or Molested R.*

Defendant challenges his conviction for annoying or molesting R., claiming there was insufficient evidence his conduct was such that (1) a normal person would unhesitatingly be irritated by it and (2) it was motivated by an unnatural or abnormal sexual interest in R.  We disagree.

A defendant is guilty of a misdemeanor if he "annoys or molests any child under 18 years of age."  (Pen. Code, § 647.6, subd. (a).)  The words "annoy" and "molest" in Penal Code section 647.6 "are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person."  (*People v. Lopez* (1998) 19 Cal.4th 282, 289.)   The statute "does not require a touching [citation] but does require (1) conduct a ' "normal person would unhesitatingly be irritated by" ' [citations] and (2) conduct ' "motivated by an unnatural or abnormal sexual interest" ' in the victim [citations]."  (*Ibid*.)   While Penal Code section 647.6 is often applied to incidents of explicit sexual conduct, it may also apply to conduct that is more ambiguous. (*People v. Kongs* (1994) 30 Cal.App.4th 1741, 1749-1750.)  For example, it applied where the defendants offered to give the child victims a ride in their car, but refused to let the child victims out of the car after driving a short distance  (*In re Sheridan* (1964) 230 Cal.App.2d 365, 370-371, 374); where the defendant repeatedly drove alongside a 12-year-old girl riding her bicycle, stared at her, and made gestures toward her with his hand and lips (*People v. Thompson* (1988) 206 Cal.App.3d 459, 461-462, 468); and where the defendant took photographs of young girls while "surreptitiously aiming his camera up a child's dress rather than photographing her face or entire clothed body"  (*Kongs*, at p. 1751).

Here, the evidence could have supported two different interpretations.  One possible interpretation was that defendant innocently mentioned his back was hurting to

his daughter, which led to a spontaneous and unexpected massage in which R. joined in. But this interpretation was one that ignored defendant's conduct leading up to the massage and directly following it and also ignored his similar conduct with H., a girl the same age as R., which was unquestionably sexually motivated, given where defendant touched H.

The other possible interpretation, the one the jury accepted, was that defendant's behavior enticed R. to participate in a massage defendant knew was going to take place. There was sufficient evidence to support this interpretation. Defendant, a man with a young daughter himself, began grooming 10-year-old R. about a month or two before implicitly soliciting the massage. He bought her an outfit and took her along for dinner. He asked her to call him "daddy" and talked to her on her cell phone. Right before the massage, he took R. along for dinner and a movie with his daughter. When the three returned to defendant's house, defendant allowed the girls in his bedroom. Then, in R.'s presence, he commented his back hurt, knowing from past experience that would lead his daughter to give him a massage. It could be inferred defendant suspected R. might join in because he had ingratiated himself toward her over the last few months. At the end of the shirtless massage, the three went to sleep together in the same bed, something they had never done before.

This conduct supported the inference defendant had a sexual interest in R. He cultivated a relationship with her that culminated in her participating in giving him a shirtless massage on his bed and then spent the night with him on that bed. His behavior toward R. was similar to his behavior toward H., which was unquestionably sexually motivated, given his touching of H. near her breasts and pubic area. (See *People v.*

6

*Martinez* (1995) 11 Cal.4th 434, 445 [a sexual intent or motivation may be inferred from the circumstances, including other acts of lewd conduct].)[1]

Under these circumstances, jurors reasonably could find that a normal person would unhesitatingly be irritated or disturbed by defendant's behavior. Defendant was an adult who took advantage of his daughter's friendship with R. to foster his own relationship with the 10 year old and then used that relationship to impliedly entice her to massage his naked back.

Accordingly, the verdict was supported by substantial evidence.

II

*The Trial Court Did Not Err In Excluding*

*The Testimony Of H.'s Fifth Grade Teacher*

Defendant contends the trial court abused its discretion and violated his due process right to present a defense when it excluded the testimony of H.'s fifth grade teacher, L.B. Defendant argues the testimony was relevant to H.'s "character for dishonesty and fabrication." As we explain, there was no error because the evidence was not relevant.

At a hearing outside the presence of the jury, L.B. testified H. had a "tendency to exaggerate" and gave two examples. The first was H. "said that she was related to one of the teachers at our school. They were cousins. They are cousins, but they're very, very distant cousins, like five or six." The second was "something that would happen on . . .

---

[1]    Defendant argues we cannot consider defendant's conduct toward H. because the jury was never instructed it could consider this evidence as going toward proving motive or intent with respect to his conduct toward R. Defendant's argument is misplaced because nothing in the instructions or the law prevented the jury from so considering. Moreover, when the prosecutor in closing argued to the jury it should consider this evidence when determining defendant's intent with R., defendant did not object.

the playground." H. "might" report hearing a bad word "like the f-word" but H. "didn't hear it properly" because the word was actually " 'fudge.' "

The trial court excluded this testimony because it "d[id]n't find this testimony is relevant to [H.'s] credibility in any way." The court explained that the relative was indeed a cousin and the playground incident was not that H. actually lied about the bad word being uttered but that H. thought she heard a bad word.

Defendant contends the court erred in excluding this evidence because it reflected the veracity of H.'s allegations against him. According to defendant, this evidence showed H. would "falsely implicate" a fellow student and exaggerate about the "close relationship" she had with a teacher.

Defendant's argument as to why this evidence was relevant ignores L.B.'s actual testimony. L.B. did not testify H. "falsely implicate[d]" a fellow student. Rather, L.B. testified H. misheard her fellow student uttering the " 'f-word' " but it was " 'fudge.' " H. reporting what she had misheard did not bear on her character for dishonesty and fabrication because there was no evidence H. reported something she knew to be untrue. Similarly, L.B. did not testify H. exaggerated about the "close relationship" H. had with a teacher. Rather, L.B. testified H. said she was "related" to one of the teachers but H. and the teacher were actually distant cousins. Again, H. stating she was related to one of the teachers without qualifying that relationship as close or distant did not bear on H.'s character for dishonesty or fabrication because there was no evidence H. lied when she said the two were related -- they in fact were.

Because L.B.'s testimony had no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," it was not relevant. (Evid. Code, § 210.) The court therefore did not abuse its discretion or deny defendant his due process right to present a defense in excluding that evidence. (*People v. Babbitt* (1988) 45 Cal.3d 660, 685 [exclusion of irrelevant evidence "did not implicate any due process concerns"].)

8

III

*The Trial Court Did Not Err In Admitting*

*Defendant's Niece's Testimony As Rebuttal Evidence*

Defendant contends the trial court abused its discretion and violated his due process right to a fair trial when it allowed the People to present evidence during their case in rebuttal that defendant had touched his niece Y. in a manner that made her uncomfortable. He claims it was actually the People who opened the door to defendant's character, and he presented evidence of his own good character only in response to the People's evidence that defendant molested girls other than H. As we explain, there was no error because the factual premise of defendant's contention is incorrect and the evidence was proper rebuttal evidence.

Defendant was the one who first opened the door that he might have molested other girls during defense counsel's cross-examination of H.'s mother. Defense counsel asked, "Now [H.] told you that she had information that other girls had been touched by [defendant] also, right?" H.'s mother responded affirmatively and that it was R. and defendant's daughter J. In fact, except for two instances, all the evidence presented during the People's case-in-chief about whether defendant had molested other girls was elicited by the defense during cross-examination.[2] This evidence included (1) H.'s mother's testimony, which we have just recounted; (2) Deputy Moreno's testimony that H. told him defendant had touched J.; (3) Deputy Cleary's testimony that H.'s mother told him, "she had information that this had happened to other girls as well"; (4) J.'s testimony that both H. and R. helped her give back massages to defendant but that other

---

[2]  The two instances where the People elicited that defendant had molested other girls were:  (1) H.'s testimony (that came after her mother's testimony) that J. told her, " 'Yeah, he does that to all my friends' "; and (2) H.'s interview with the Child Advocacy Center in which H. said defendant molested three of her friends and J.

girls had never slept over and/or met defendant; and (5) Detective Stone's testimony that J. told her H. said defendant touched H. but she did not know of her father touching anyone else. What counsel was effectively doing with this evidence was setting the stage to present testimony during the defense case that defendant was a man of good character who did not molest any girls.

This testimony came from at least seven witnesses, including (1) E., who was J.'s classmate, who testified that she went over to defendant's house multiple times and spent the night, and nothing happened ; (2&3) both of E's parents, who testified they knew defendant and never saw him do anything that caused them concern; (4&5) both of defendant's employers, who testified they never saw defendant behave inappropriately with any girls; and (6&7) both defendant's brother and defendant's nephew, who also testified they noticed nothing unusual about the way defendant interacted with J. or other girls.

It was only after all of this defense evidence that the People sought to introduce Y.'s testimony to rebut evidence of defendant's good character. That testimony was that when Y. was around 11 or 12 years old, defendant forced her to keep hugging him and when she tried to move away, he "accidently touched [her] boob." The incident made her feel "uncomfortable," so she told her mom. As we explain next, this evidence was proper in rebuttal.

A defendant may " 'elect[] to initiate inquiry into his own character' " but " 'the price a defendant must pay for attempting to prove his good name is to throw open a vast subject which the law has kept closed to shield him.' " (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357.) The court's decision to allow this type of rebuttal evidence is reviewed for abuse of discretion. (*People v. Young* (2005) 34 Cal.4th 1149, 1199 [standard of review].) Here, there was no abuse. As the trial court explained when admitting the evidence: the rebuttal evidence was relevant because, "[t]he defense has brought in a number of witnesses to testify that . . . they've never seen [defendant] do

10

anything inappropriate with any young girls" and "[d]efense counsel pretty much asked all the witnesses who testified, 'Did you ever see anything of any concern that [defendant has] done around young girls?' [¶] So he has opened the door." It was also not unduly prejudicial because, as the trial court explained, Y. was similar in age to the alleged victims, the incident involving Y. was not as egregious as that involving victim H., and the defense could cross-examine Y. on her belief she thought the touching was an accident. "Given our conclusion, we also reject defendant's constitutional claim. Application of the ordinary rules of evidence does not infringe on a defendant's constitutional rights." (*People v. Uecker* (2009) 172 Cal.App.4th 583, 599, fn. 11.)

IV

*The Court Did Not Err In Keeping Juror No. 4 On The Panel*

Defendant's final contention is the trial court erred in keeping Juror No. 4 on the panel because she (1) attended a seminar that the prosecutor attended as well) where the keynote speaker was the People's expert witness; and (2) committed misconduct in failing to reveal certain biases during jury selection. As we explain, the trial court did not err because: (1) there was substantial evidence to support the trial court's conclusion that it had not been shown Juror No. 4's inability to fairly and impartially serve appeared as a demonstrable reality; and (2) on our independent review, we conclude Juror No. 4 did not hide any bias and was not actually bias against defendant.

A

*Factual Background Relating To Juror No. 4*

Prior to jury selection, each prospective juror filled out a questionnaire. On her questionnaire, Juror No. 4 stated she was a social worker for San Joaquin County, which she later explained entailed working with "pregnant or parenting teens." She attended the child abuse symposium annually. In regard to children's allegations of abuse, Juror No. 4 felt "for the most part that children are innocent victims. When they say they have been abused it is true for the most part. Sometimes, however, in rare instances you will have

11

an adult make them say things [and] accuse someone for their own motives." She had experience with groups whose objective was influencing the laws. She had followed the Shaniya Davis case in the media, which she later explained was a "high-profile case out of North Carolina" to which she did not have a connection but "took very hard."

During trial, the prosecutor alerted the court she had seen Juror No. 4 at a child abuse symposium the prosecutor had attended the previous day where the People's expert, David Love, was the keynote speaker. Love's lecture was about teen suicide, but it also covered child sexual abuse accommodation syndrome. The prosecutor did not talk with the juror or try to make eye contact.

The court questioned Juror No. 4. Juror No. 4 stated that during the lecture, the case was "totally out of [her] mind." While Love "did talk about like child abuse," Juror No. 4 never thought the information he imparted should be considered during jury deliberation. When asked if anything Love said at the lecture would affect her ability to be fair, Juror No. 4 responded, "it was a long presentation" and that "after a while" she "kind of like tuned out" or "just didn't focus" on it. Love "just kind of sounded like Charlie Brown's teacher after awhile." She "absolutely" could be fair to both sides and keep an open mind.

Defendant made a motion to have Juror No. 4 removed because the juror did not reveal she would be attending the seminar during this trial and because the keynote speaker was the People's expert in this trial. The court denied the motion, noting that Juror No. 4 disclosed she attended the symposium annually and crediting the juror's response that she could be fair to both sides.

Following the guilty verdicts, defendant filed a new trial motion alleging, among other things, Juror No. 4 "affirmatively failed to disclose [her] bias." To support his claim, defendant attached a printout of an online petition Juror No. 4 had signed the year before trial advocating for passage of a federal one-strike sentencing law for defendants who had committed enumerated sex offenses against children. On the petition, Juror No.

12

4 wrote, "All children should have the right to live in this world. To have a happy and peaceful life without a sadistic predator trying to cause harm to them and ruin their innocence or take their life. Love you Shaniya!"

The court denied the motion, explaining Juror No. 4 disclosed her feelings about child sexual abuse, did not "hid[e] any bias," and did not have any actual bias against defendant.

B

*There Was Substantial Evidence Juror No. 4's*

*Ability To Fairly And Impartially Serve Appeared As A Demonstrable Reality*

Defendant contends the court erred when it refused to discharge Juror No. 4 after it was revealed she attended the child abuse symposium at which Love was the keynote speaker. Defendant explains his contention as follows: "[He] is not suggesting that [Juror No. 4] committed any misconduct in attending the symposium. Admittedly, she had revealed during jury selection that she attends the symposium annually, and the court never instructed her not to attend this year. However, once it was revealed that she did attend and that she heard . . . Love speak, the court had a duty to discharge her because her exposure to the speech had the potential of influencing her view of . . . Love's credibility as a witness."

"Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged . . . if supported by substantial evidence." (*People v. Holt* (1997) 15 Cal.4th 619, 659.) Applying this standard, defendant's contention fails.

Contrary to defendant's contention, the issue is not whether Juror No. 4's exposure to Love's lecture "had the potential of influencing her view" or "arguably created a substantial likelihood of bias on her part." Rather, the issue is whether her inability to

13

perform a juror's functions appeared as a demonstrable reality.  It did not, based on the juror's own responses, which the court credited.   Juror No. 4 denied there was anything about Love's lecture that made her think about this case.  During the lecture, the case was "totally out of [her] mind."  While Love "did talk about like child abuse," she never thought the information he imparted should be considered during jury deliberation.  When asked if anything Love said at the lecture would affect her ability to be fair, she responded that "it was a long presentation" and that "after a while" she "kind of tuned out" or "just didn't focus" on it.  She "absolutely" could be fair to both sides and keep an open mind.  On this record, there was substantial evidence to support the trial court's ruling keeping Juror No. 4 on the panel.

C

*The Court Did Not Err In Denying The Motion For New Trial Because Juror No. 4*
*Did Not Hide Any Bias Or Was Not Actually Bias Against Defendant*

Defendant contends the court erred when it denied his motion for a new trial based on Juror No. 4's misconduct, which was her failure to disclose certain biases she had.  Specifically, defendant claims she "failed to disclose . . . she had signed a petition calling for harsh penalties on child sex offenders and included with her signature a comment referring to child abusers as 'sadistic predators.' "

We review independently the trial court's denial of a new trial motion based on alleged juror misconduct.   (*People v. Ault* (2004) 33 Cal.4th 1250, 1261–1262.)  However, we accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.  (*People v. Gamache* (2010) 48 Cal.4th 347, 396.)

Here, defendant's new trial motion was based on Juror No. 4's failure to disclose she had signed an online petition the year before trial advocating passage of a federal one-strike sentencing law for defendants convicted of enumerated sex offenses against children.  The court denied the motion, explaining Juror No. 4 disclosed her feeling about

14

child sexual abuse, did not "hid[e] any bias" and did not have any actual bias against defendant.

On our independent review, we agree Juror No. 4 did not hide any bias and was not actually bias against defendant based on her support of the petition. On her juror questionnaire, Juror No. 4 admitted the following: she had experience with groups whose objective is influencing the law; and she felt that in regard to allegations of child sexual abuse, "for the most part that children are innocent victims. When they say they have been abused it is true for the most part. Sometimes, however, in rare instances you will have an adult make them say things and accuse someone for their own motives." Although it could seem as though Juror No. 4 might have been predisposed to believe a child victim, she clarified during voir dire that she has learned, "you have to look at all the evidence before you come to a conclusion . . . [and] have an open mind and hearing everything out before you actually decide whether it's true or not." In light of her response in the questionnaire that she had participated in efforts to change laws and during voir dire that she had to look at all the evidence before coming to a conclusion, we find substantial evidence to support the trial court's conclusion that she did not hide any bias against defendant and indeed lacked bias against defendant. While defendant relies on Juror No. 4's comment on the petition that children have the right to live without "a sadistic predator" to show she had bias against those "accused of sexual abuse," defendant's reliance is misplaced. Juror No. 4's comment was directed at those who commit child sexual abuse not those simply accused of abuse. The court properly denied the new trial motion.

15

DISPOSITION

The judgment is affirmed.


      ROBIE      , Acting P. J.


We concur:


      BUTZ      , J.


      DUARTE      , J.